IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DANIAL ANTHONY HOLLON,

   Plaintiff,       NO. 2:17-cv-0038

vs.             JUDGE ALETA A. TRAUGER
               Magistrate Judge Kemp
NANCY A. BERRYHILL,
COMMISSIONER OF SOCIAL
SECURITY,

   Defendant.

To: The Honorable Aleta A. Trauger, Judge

## REPORT AND RECOMMENDATION

   This is an action instituted under the provisions of 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Commissioner of Social Security denying Plaintiff's applications for a period of disability and disability insurance benefits and for supplemental security income. Plaintiff filed a motion for judgment on the administrative record on November 29, 2017 (Doc. 15). The Commissioner responded on December 13, 2017 (Doc. 17). For the following reasons, it will be recommended that the Motion for Judgment be **GRANTED** to the extent that this case be **REMANDED** to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

### I. Background

   Plaintiff filed his applications for benefits on April 18, 2013, asserting that he became disabled on May 4, 2012. On November 7, 2013, those applications were denied, and Plaintiff's request for reconsideration was denied on March 24, 2014. He then asked for a hearing before an Administrative Law Judge (ALJ). A hearing was held on November 24, 2015. Plaintiff, Plaintiff's wife, and a vocational expert, Charles E. Wheeler, testified at the hearing.

   In a decision dated February 29, 2016, the ALJ determined that Plaintiff did not meet the requirements for disability. Plaintiff sought review of that decision from the Appeals Council, but his appeal was denied on May 11, 2017. The case is now before this Court to determine which party is entitled to judgment on the administrative record (Doc. 11).

## II. The Findings and Conclusions of the ALJ

In his decision, the ALJ made the following findings of fact and conclusions of law (with some legal references omitted):

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2017.

2. The claimant has not engaged in substantial gainful activity since May 4, 2012, the alleged onset date.

3. The claimant has the following severe impairments: low vision and degenerative disc disease.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with limitations. He cannot perform work that requires fine depth perception. He can only occasionally climb, balance stoop, kneel, crouch and crawl. He cannot be exposed to workplace hazards such as moving machinery or unprotected heights.

6. The claimant is unable to perform his past relevant work as a machine operator or tractor-trailer driver.

7. The claimant was born on September 21, 1974 and was 37years old, which is defined as a younger individual aged 18-49, on his alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not he has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.

11. The claimant has not been under a disability, as defined in the Social

Security Act, from May 4, 2012, through the date of this decision.

### III. Plaintiff's Claims

Plaintiff asserts the following statements of error:

1. The ALJ erred in finding that Plaintiff adequately waived his right to a representative..

2. The ALJ erred in finding the Plaintiff's mental impairment and carpal tunnel syndrome non-severe..

(Memorandum in support, Doc. 16, at 13, 15).

### IV. Standard of Review

This Court has set forth the applicable standard of review in this fashion:

> This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means " 'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id*. (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.,* 644 Fed.Appx. 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).
>
> Accordingly, this Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

*Allen v. Berryhill*, 273 F. Supp. 3d 763, 770 (M.D. Tenn. 2017)

## V. Summary and ALJ's Evaluation of Relevant Evidence

### A. Hearing Testimony

At the beginning of the administrative hearing, the ALJ questioned Plaintiff about the status of his representation. Plaintiff had counsel at one time but they withdrew before the hearing. The ALJ told Plaintiff that he had the right to have a representative and the right to have an attorney assist at the hearing. He then provided a detailed explanation of what a representative might be able to do and told Plaintiff that any fee charged by a representative would have to be approved by the ALJ. Next, he explained that most representatives took social security cases on a contingent fee. He concluded by asking Plaintiff if he wished to proceed with the hearing that day without representation.

Plaintiff advised the ALJ that he had tried to obtain an attorney. He had been turned down by some of the lawyers he had spoken with, but said that he was waiting to hear back from an attorney whom he contacted three months before. He asked what would happen if he elected to proceed without counsel, and was told that "we'll have the hearing, and then I will issue a decision." (Tr. 192). The ALJ also explained that the decision would tell Plaintiff the reasons for any denial of benefits and explain how he could appeal, and he advised Plaintiff that he (the ALJ) would request any additional pertinent medical records. He again told Plaintiff that the decision to proceed was entirely up to him, and that he could obtain a continuance if he wanted to continue to try to get a lawyer. Plaintiff responded by saying "Yeah, let's go ahead and just I guess have it...." *Id*.

Once the decision was made to go forward, Plaintiff testified that he had not worked since 2012. He had been employed by a company that made parts for diesel trucks, and he was a machine operator there. Before that, he drove a truck, and had been a machine operator for other companies as well. He had lost his CDL due to vision problems. However, he had been able to see only out of his left eye since he was 18 years old.

Plaintiff also testified that he was seeing a physician and a mental health counselor. Recently, he had switched pain clinics. He said the switch was voluntary and not due to any medication abuse. He said that he lived with his wife, who is employed. He watched television while she was at work. He did not believe he could work because of numbness in his arms and legs, and due to constant pain. It was made worse by physical activity. On a daily basis, he did very little walking or driving. Pain medication was the only thing that brought him any relief. He did not do any household chores.

Plaintiff's wife Lisa was the next witness. She first explained that Plaintiff had an appointment coming up to check his heart, and that he might get a stent or undergo open heart surgery. She said he had heart problems on and off for several years. She further testified that Plaintiff was subject to falls and to dropping objects. She had to assist him with showering and

said that his pain was extremely bad to the point where he almost passed out. (Tr. 193-212).

Finally, Charles Wheeler, the vocational expert, testified. He classified Plaintiff's past work as a machine operator as a medium, semi-skilled job. The job of tractor-trailer driver was also medium and semi-skilled. There was no other past relevant work.

The ALJ then asked Mr. Wheeler a hypothetical question about a person of Plaintiff's age, education, and work experience who could work at the light exertional level with occasional postural activities. The person also could not be exposed to workplace hazards like unprotected heights and moving machinery and could not do jobs requiring fine depth perception. Mr. Wheeler testified that someone with those limitations could not do Plaintiff's past work but could be employed as a cleaner/housekeeper, labeler, or storage facility rental clerk. He also gave numbers for those jobs as they exist in the national economy. Adding a restriction on concentrated exposure to pulmonary irritants would not affect that job base, nor would a restriction on being able to follow only simple instructions and adapting to only occasional changes in the workplace. However, if the person had to lie down for an hour during the workday or had to miss two days of work per month, he or she could not be employed. (Tr. 214-18).

## B. Medical Evidence

Plaintiff's statement of errors focuses primarily on his carpal tunnel syndrome and his mental impairments. The Court will summarize the pertinent evidence relating to each.

### 1. Carpal Tunnel Syndrome

The only medical evidence which Plaintiff discusses concerning his carpal tunnel syndrome is a nerve conduction study performed on June 20, 2013. That study (Tr. 697), done by Neuromed, Inc./Neurometrics, Inc., shows that Plaintiff was referred for the study based on complaints of neck pain and numbness in his hands accompanied by dropping. As it relates to carpal tunnel syndrome, the study showed "electrophysiologic evidence of a chronic moderate distal median mononeuropathy at the right wrist with ongoing early denervations, as maybe (sic) seen in a carpal tunnel syndrome." There is a handwritten note on that form which reads "CTS - refer surgery." Although not cited in his memorandum, Plaintiff also mentioned numbness in his right arm, radiating to his right hand, during the consultative medical evaluation done on October 12, 2013, *see* Tr. 709, and to a physician's assistant, Sandra Fields, during a new patient interview on June 11, 2013 (Tr. 743). In a letter written on October 1, 2014, Ms. Fields referred to carpal tunnel syndrome as one of several conditions which limited Plaintiff's ability to work, and she reiterated that opinion in a July 23, 2015 note. (Tr. 758, 759).

Additionally, there are other documents which alerted the Social Security Administration that Plaintiff might be suffering from carpal tunnel syndrome. The Disability Report - Field Office form completed in connection with Plaintiff's application for benefits lists "numbness in right arm" as one of his medical conditions. (Tr. 417). The Claimant's Recent Medical

Treatment form which Plaintiff completed prior to the hearing also states that he had undergone surgery for carpal tunnel syndrome at DeKalb Hospital (although it does not say when that happened). (Tr. 492). Plaintiff notes that the records from this surgery do not appear in the administrative record, and that appears to be correct. Lastly, both of the opinions rendered by the state agency physicians reflect right arm numbness as one of the alleged impairments, and both show a diagnosis of "Disorders of Muscle, Ligament and Fascia" as one of three severe impairments borne out by the medical evidence, although there is no further indication as to what condition that diagnosis relates to. Both reviewers also said that there was nothing to explain right arm numbness, although both appear to have had access to the nerve conduction study where carpal tunnel syndrome was mentioned.

### 2. Mental Health Impairments

Plaintiff also cites to only one document relating to mental health treatment, a note from an initial diagnostic interview done at Life Care Family Services on July 29, 2015. Plaintiff had been referred by his primary care physician for an evaluation of medication needs for conditions such as anxiety and sleep problems. He was taking Zoloft and Xanax at the time. Plaintiff reported symptoms relating to anger management, a panic disorder, and post traumatic stress disorder. The assessment indicated that Plaintiff "does meet criteria for severe panic D/O without Agoraphobia. Client also has some symptoms of PTSD .... He would benefit from individual therapy and medication management ...." (Tr. 925). A personality disorder was also diagnosed, and Plaintiff's GAF was rated at 49. There are additional treatment notes from Life Care Family Services running through December, 2015, showing that Plaintiff was reporting difficulty sleeping and had some issues with irritability, and that his medication regimen was changed almost on a monthly basis. Presumably because Plaintiff's applications did not allege any psychological impairments, and because of the timing of the Life Care Family Services report, no state agency psychological review was done relating to mental impairments.

### C. The ALJ's Decision

As noted, the ALJ determined that Plaintiff suffered from only two severe impairments - low vision and degenerative disc disease. His discussion of other medically determinable impairments was brief. With respect to other physical impairments, he stated that "[w]hile the claimant has also been diagnosed with hypertension, rhinitis, heartburn, cholelithiasis, and mild cubital/carpal tunnel syndrome, the evidence does not establish these conditions impose more than minimal limitations on his ability to perform basic work activities" - *i.e.* that they were not "severe" within the meaning of the Social Security Act. (Tr. 38). The only specific mention of the EMG study came in the ALJ's evaluation of Plaintiff's residual functional capacity, with the ALJ characterizing that study as showing "no evidence of an active or chronic cervical radiculopathy or plexopathy." (Tr. 42). The reference in the document to carpal tunnel syndrome was not mentioned.

The ALJ then analyzed Plaintiff's claimed mental impairments using the criteria set forth in 20 C.F.R. §404.1520a. He described the impairments generally as "anxiety related disorders"

but concluded that they were well-controlled with medication and did not impose more than mild limitations on Plaintiff's activities of daily living, social functioning, or ability to concentrate, persist, and remain on pace. Further, the evidence did not reveal any episodes of decompensation. Thus, those impairments were also deemed not severe. Although the Life Care Family Services report was mentioned by exhibit number (the ALJ cited, in support of his finding on this issue, Exhibits 3F-6F, 8F, 9F, 13F, and 17F-20F; the report is Exhibit 19F), the ALJ did not discuss or acknowledge its contents..

## VI. Discussion

### A. Waiver of Right to Representation

Plaintiff's first statement of error asserts that the ALJ should not have proceeded with the hearing because Plaintiff did not validly waive his right to representation. Citing to *Duncan v. Sec'y of HHS*, 801 F.2d 847, 855 (6th Cir. 1986), Plaintiff argues that a social security claimant has a statutory right to legal representation at an administrative hearing and that claimants must be informed of their right to counsel. He further asserts that any waiver of that right must be knowing and voluntary. In this case, he characterizes his waiver as "reluctant," and also claims that although the ALJ (as he was required to do) informed Plaintiff that if he waived counsel, the ALJ would obtain all of the pertinent medical records, the ALJ subsequently failed to request records from Plaintiff's cardiologist, records pertaining to Plaintiff's carpal tunnel syndrome, or all of the records of Plaintiff's pain management. Since the ALJ then decided that Plaintiff's carpal tunnel syndrome was not a severe impairment and also questioned the credibility of Plaintiff's assertion of disabling pain, these omissions, according to Plaintiff, prejudiced his case.

In response, the Commissioner cites, first, to that portion of the hearing transcript where the ALJ discussed representation with Plaintiff and Plaintiff elected to proceed. As additional support, the Commissioner points out that there are other written materials in the record which Plaintiff received and which explained his right to representation. *See* Tr. 321, 324, 326. Lastly, the Commissioner notes that Plaintiff also signed a written waiver of the right to counsel. *See* Tr. 378,

The Commissioner's citations to the record reveal that Plaintiff was informed of his right to be represented by counsel at the hearing by the notice of hearing sent to him on July 6, 2015 (Tr. 320-324). One of the items attached to that notice was a two-page document entitled "Your Right to Representation." (Tr. 326-27). That document clearly informed Plaintiff of his right to have a legal representative assist him in interacting with the Social Security Administration, as well as information about what types of tasks a legal representative might perform (*e.g.* getting information from the file, helping to obtain medical records, perfecting an appeal, and preparing for the hearing) as well as information about fee agreements. Additionally, on November 24, 2015, the day of the hearing, Plaintiff signed a "Waiver of Right to Representation" which again explained in writing his right to representation, the benefits of representation, and also his right o proceed without representation, in which case the ALJ would obtain the evidence relevant to this case. That information was followed by two questions: "Do you understand your rights to

representation?" and "Do you wish to proceed without a representative?" Plaintiff hand-wrote the word "yes" in response to both questions and signed the form. (Tr. 378). The Court's decision as to whether this constituted a knowing waiver of the right to representation must be made in light of this evidence.

The Court agrees with the Commissioner's statement that "[t]here is little more that SSA could have done to advise Plaintiff of his right to counsel and document his waiver of that right at the hearing both orally and in writing." *See* Doc. 17, at 5. As the Commissioner's memorandum notes, this Court, in *Rutherford v. Astrue*, 2011 WL 4014431, *7 (M.D. Tenn. Sept. 9, 2011), said that where "the ALJ confirmed that Plaintiff had read, understood, and signed the waiver of right to representation, and ... confirmed that Plaintiff intended to represent [himself] at the hearing and wanted to proceed, the ALJ complied with *Duncan* and is not required to do more." There is no evidence in the record to support the claim that Plaintiff's waiver of the right to representation was not knowing or voluntary. Plaintiff was given a clear choice between proceeding that day and obtaining a continuance so that he could continue with his efforts to obtain counsel. There is nothing in either the statements made by the ALJ on the record, or in the form which Plaintiff signed, that could be construed as either coercive or misleading. As discussed below, Plaintiff was told, and was entitled rely on the fact that, since he was not represented, the ALJ would assume primary responsibility for obtaining the pertinent medical records. Whether the ALJ carried out that duty properly is a different subject, however, from whether Plaintiff knowingly and voluntarily waived his right to representation. Finding that the record supports the Commissioner's position on this issue, the Court concludes that this statement of error lacks merit.

### B. Development of the Record

As part of both of his statements of error, Plaintiff argues that the ALJ did not properly discharge his duty to develop the record. Since that argument focuses largely on carpal tunnel syndrome, which is also one of the subject of the second statement of error, the Court will discuss the carpal tunnel issue in the context of this argument.

The Commissioner concedes both that an ALJ has a duty fairly to develop the record, and that this is a heightened duty when a claimant is not represented. *See Thomas v. Comm'r of Social Security* 550 Fed. Appx. 289, 290 (6th Cir. Jan. 15, 2014), *citing Lashley v. Sec'y of HHS*, 798 F.2d 1048, 1051 (6th Cir. 1983). However, the Commissioner contends that the ALJ discharged that duty properly by obtaining an additional 200 pages of medical records after the hearing. The Commissioner also argues that had there been any additional records pertinent to Plaintiff's carpal tunnel syndrome, it is likely that Plaintiff's counsel would have submitted them at the Appeals Council level (although the Commissioner also notes, correctly, that the ALJ could not have considered any such evidence and that this Court could not use it to question the correctness of the ALJ's decision).

As the records cited above reflect, the Commissioner was on notice from the application

time forward that Plaintiff asserted some type of impairment of his right hand or arm. Carpal tunnel syndrome was identified as early as 2013. The ALJ's decision makes no mention of the fact that the EMG report indicates that a referral for surgery was recommended, and despite an indication in the record that Plaintiff actually had such surgery (and the name of the hospital where it occurred), the ALJ did not get the hospital records, and nothing in the record suggests that he made an effort to do so. That failure, coupled with both Plaintiff's and his wife's testimony that he dropped objects and had difficulty grasping with his right hand, persuade the Court that the ALJ should have pursued those records. That is especially true since, based on the relatively sparse record before him, the ALJ concluded that Plaintiff's carpal tunnel syndrome was not severe. It is not proper to fault Plaintiff himself for not obtaining or asking for these records, since he was entitled to rely on the ALJ's statement that the ALJ would do so, and it would undercut the significance of the ALJ's special duty to develop the record on behalf on an unrepresented claimant if the Court were to fault the claimant for not doing more to develop the record on his own behalf. Under these circumstances, the case should be remanded to the ALJ for further proceedings including obtaining and evaluating the surgical and other records relating to Plaintiff's carpal tunnel syndrome.

### 3. Mental Health Impairments

The Court's conclusion that the ALJ did not properly develop the record as it pertains to carpal tunnel syndrome and, by extension, that the ALJ was unable properly to determine if that impairment was severe, largely eliminates the need to address Plaintiff's claim that the ALJ made a similar error with respect to Plaintiff's mental health impairments. The Court has some concerns about the adequacy of the ALJ's analysis of the severity of those impairments given the extremely brief discussion of the notes from Life Care Family Services and the indication in those notes of some potentially significant psychological limitations. A remand will also give the Commissioner the opportunity to consider the additional evidence about mental health impairments which was submitted to the Appeals Council and to make a more informed determination about whether any of those impairments are severe and, if so, how they limit Plaintiff's ability to perform work-related functions.

### VII. Recommendation

For all the reasons set forth above, the Court **RECOMMENDS** that the Motion for Judgment (Doc. 15) be **GRANTED** to the extent that this case be **REMANDED** to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

### VIII. Procedure on Objection

If any party seeks review of this Report and Recommendation by the assigned District Judge, that party may, within 14 days, file and serve on all parties written objections to the Report and Recommendation which specifically identify the part of the Report to which

objection is made as well as the reasons supporting that objection.  *See* 28 U.S.C. 636(b)(1); Fed.R.Civ.P. 72(b).  Any response must be filed withing 14 days thereafter.  Failure to object to a Report and Recommendation waives any right to obtain *de novo* review by the District Judge and waives any issues that might otherwise be raised on appeal.  *See, e.g., Robert v. Tesson,* 507 F.3d 981,994 (6th Cir. 2007)

/s/ Terence P. Kemp
United States Magistrate Judge